**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
PATRICIA MANN-NABEL,

                          *Plaintiff,*                           **16 CV 9382**

    *v.*

WESTCHESTER MEDICAL CENTER *and* DENISE DAVIS,      **SECOND AMENDED**
*individually,*                                             **COMPLAINT**

                          *Defendants*.
-------------------------------------------------------------------------X

        Plaintiff Patricia Mann-Nabel, by her counsel, The Harman Firm, LLP, alleges for her Second Amended Complaint against Defendants Westchester Medical Center and Denise Davis as follows:

<u>**NATURE OF THE ACTION**</u>

        1.      Plaintiff Patricia Mann-Nabel ("Plaintiff" or "Ms. Mann-Nabel") was employed as a Registered Nurse ("RN") by Defendant Westchester Medical Center ("Corporate Defendant" or "WMC"), a regional hospital located in Valhalla, New York. Defendant Denise Davis ("Ms. Davis" or "Individual Defendant") is WMC's Deputy Director of Nursing and was Plaintiff's direct supervisor at WMC.

        2.      Plaintiff seeks damages and costs against Corporate Defendant for discriminating against her based on her disability by failing to provide her with a reasonable accommodation and ultimately terminating her employment because of her disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

        3.      Plaintiff also seeks damages and costs against both Defendants for discriminating against her based on her disability by failing to provide her with a reasonable accommodation

1

and ultimately terminating her employment because of her disability, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*

## JURISDICTION AND VENUE

4.      Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims arising under the ADA.

5.      Pursuant to 28 U.S.C. § 1332, this Court has supplemental jurisdiction over Plaintiff's claims arising under the NYSHRL, as those claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## ADMINISTRATIVE PREREQUISITES

7.      All conditions precedent to maintaining this action have been fulfilled.

8.      Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  The EEOC issued a Right-to-Sue Letter dated November 15, 2016, relating to the discriminatory acts described in this Complaint.

9.      This action was properly instituted within ninety (90) days of the issuance of the Right-to-Sue Letter.

## TRIAL BY JURY

10.     Plaintiff respectfully requests a trial before a jury.

## PARTIES

11.     At all times relevant hereto, Plaintiff was and is a resident of Dutchess County in the State of New York.

12.     Upon information and belief, at all times relevant hereto, Corporate Defendant was and is a regional hospital organized under the laws of the State of New York with its principal place of business at 100 Woods Road, Valhalla, New York 10595.

13.     Upon information and belief, at all times relevant hereto, Individual Defendant was and is Corporate Defendant's Deputy Director of Nursing.

## STATEMENT OF FACTS

14.     Ms. Mann-Nabel is diagnosed with Bipolar I Disorder ("BD"). Ms. Mann-Nabel's condition causes her to experience episodes of abnormally elevated mood ("mania"), as well as episodes of abnormally depressed mood ("depression").

15.     On July 20, 1992, WMC hired Ms. Mann-Nabel as an OB/GYN Registered Nurse.

16.     Ms. Mann-Nabel's job responsibilities included patient and infant assessment and delegating tasks to other nursing staff to care for acute and critically ill patients.

17.     Throughout the over twenty (20) years that she was employed at WMC, Ms. Mann-Nabel was a dedicated and reliable employee who consistently fulfilled all of her job responsibilities.

18.     In 2009, Denise Davis, WMC's Deputy Director of Nursing, became Ms. Mann-Nabel's supervisor.

19.     In or around summer 2015, Ms. Mann-Nabel applied for intermittent Family and Medical Leave Act ("FMLA") leave due to a chronic serious health condition (i.e., her BD), which WMC approved.

20.     At this time, Ms. Mann-Nabel disclosed her BD diagnosis to WMC and discussed the details of her medical condition with WMC.

21.     Consequently, Ms. Davis and WMC were aware of Ms. Mann-Nabel's disability, as well as its treatment and triggers.

22.     After Ms. Davis learned of Ms. Mann-Nabel's disability through Ms. Mann-Nabel's request for FMLA leave, Ms. Davis' attitude towards Ms. Mann-Nabel changed noticeably, and she began to treat Ms. Mann-Nabel less well than other WMC employees.

23.     Ms. Davis treated Ms. Mann-Nabel more harshly than other WMC employees and held Ms. Mann-Nabel to an impossible standard because of Ms. Mann-Nabel's disability.

24.     For example, in November 2015, Ms. Davis suspended Ms. Mann-Nabel for purported "insubordination" because Ms. Mann-Nabel refused to admit a new patient while her unit was responding to a "Code Grey" crisis situation involving a violent patient who needed to be restrained.  Ms. Davis then refused to communicate with Ms. Mann-Nabel regarding the unjust "suspension."

25.     Ms. Davis never treated non-disabled WMC employees in this manner.

26.     In November 2015, Ms. Mann-Nabel learned that she needed to undergo a total hysterectomy, which would be scheduled for February 2016.

27.     In and around December 2015, Ms. Mann-Nabel informed Sue Barnum, a Nurse Manager at WMC, of her upcoming surgery and related need to take medical leave.

28.     Ms. Barnum approved Ms. Mann-Nabel's request for medical leave and suggested that Ms. Mann-Nabel use her accrued vacation time to cover her absence.

29.     Ms. Mann-Nabel used her accrued vacation time to cover her surgery-related absence from January 28, 2016, to February 19, 2016.

30.     In and around early February 2016, while Ms. Mann-Nabel was on leave, Ms. Barnum informed Ms. Mann-Nabel that her schedule was being changed.

31.     There are two shifts for RNs at WMC: 7:00 a.m. to 7:00 p.m. (the "day shift") and 7:00 p.m. to 7:00 a.m. (the "night shift").

32.     For eighteen (18) years, Ms. Mann-Nabel had worked the night shift.

33.     Though she had never previously received any complaints, warnings, or discipline related to her charting, WMC now told Ms. Mann-Nabel that she would have to work the day shift so that her supervisors could better "monitor [her] charting."

34.     On February 5, 2016, Ms. Mann-Nabel's psychiatrist, James Weisbard, and therapist, Jean Simone, sent a letter to Allyson Chamberlaine (WMC's FMLA Program Overseer) and Christine La Perche (Ms. Mann-Nabel's union representative), requesting that Ms. Mann-Nabel be returned to the night shift to accommodate her BD.

35.     Dr. Weisbard and Ms. Simone warned that working the day shift was likely to have a serious negative impact on Ms. Mann-Nabel's health, as "[s]leep disturbance and circadian dysregulation are critical pathophysiological elements" in BD.  Specifically, they expressed concerns that the schedule change could trigger an episode of mania or depression, stating explicitly that "Ms. Mann-Nabel is much more vulnerable to a recurrence of mania and/or depression due to change in her working hours."

36.     However, Ms. Mann-Nabel received no response from WMC to the letter from her mental health providers requesting a disability-related accommodation.

37.     On February 15, 2016, Ms. Mann-Nabel reminded Ms. Davis of the letter from her doctors and reiterated that, due to her BD, she was unable to work the day shift.

38.     Ms. Davis continued to ignore Ms. Mann-Nabel's doctors' instructions and dismissed Ms. Mann-Nabel's second request for a disability-related accommodation, responding only, "You still have to work days, Trish."

39.     Ms. Mann-Nabel returned to work on February 19, 2016, now scheduled for the day shift.

40.     After making the switch to the day shift, Ms. Mann-Nabel's BD symptoms worsened significantly, just as her psychiatrist and therapist had warned they would.

41.     Ms. Mann-Nabel began experiencing sleeplessness, nervousness, anxiety, depression, paranoia, and difficulty concentrating.

42.     Although she attempted to sleep between 11:00 p.m. and 6:00 a.m., she was regularly unable to fall asleep until 3:00 a.m. or later, meaning that she often had to go to work having gotten three (3) or fewer hours of sleep.

43.     In addition, Ms. Mann-Nabel felt constantly monitored and targeted by Ms. Davis, which further increased her levels of stress and anxiety.

44.     Ultimately, Ms. Mann-Nabel's schedule change and Ms. Davis' discriminatory treatment triggered a BD episode, for which Ms. Mann-Nabel needed to take FMLA leave from March 4, 2016, to March 16, 2016.

45.     Ms. Mann-Nabel returned to work on or about March 17, 2016.

46.     On April 18, 2016, Ms. Mann-Nabel became ill at work and was sent home.

47.     Upon being sent home, she was told by Ms. Davis that she would need a doctors' note to be allowed to return to work.

48.     As such, Ms. Mann-Nabel went to her doctor on the following day, April 19, 2016, so that she could obtain the required note.

49.     Upon Ms. Mann-Nabel's return to work on or about April 20, 2016, she was immediately called to a meeting with Ms. Davis.

50.	In this meeting, Ms. Davis claimed that Ms. Mann-Nabel was "an emotional rollercoaster." She accused Ms. Mann-Nabel of being "incompetent" and "unprofessional" because of her BD, telling her, "Your bipolar makes you unable to concentrate."

51.	WMC made no effort to engage in the interactive process to accommodate Ms. Mann-Nabel's medical condition.

52.	Ms. Davis gave Ms. Mann-Nabel an ultimatum: resign or be terminated.

53.	Ms. Davis insisted that Ms. Mann-Nabel resign upon threat of termination.

54.	Ms. Mann-Nabel refused to resign, preferring to keep her employment with WMC.

55.	Because of Ms. Davis and WMC's pressure to retire, Ms. Mann-Nabel contacted her union representative for advice.

56.	Given Ms. Mann-Nabel's ongoing medical issues, her union representative advised her to take extended sick leave, which she began on or about April 21, 2016, during which time she received only half pay.

57.	While out on extended sick leave, Ms. Davis and WMC continued to pressure Ms. Mann-Nabel to resign, sending her WMC's resignation documents.

58.	At the end of her exteneded sick leave, on or about September 24, 216, Ms. Davis and WMC repeated to Ms. Mann-Nabel the same ultimatum: resign or be terminated.

59.	As a result of this ultimatum, Ms. Mann-Nabel signed the resignation paperwork. In reality, she had already been terminated.

60.	At the time of termination, her compensation included a salry $106,523, with various benefits.

61.     As a result of WMC's failure to accommodate Ms. Mann-Nabel and Ms. Davis'

animus towards individuals with BD, WMC terminated Ms. Mann-Nabel's employment.

62.     At the time of her termination, Ms. Mann-Nabel was 55-years old and had 23

years with WMC.

63.     Had WMC not terminated Ms. Mann-Nabel's employment, she likely would have

continued to work for another 6 years with WMC before retiring.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Failure to Provide a Reasonable Accommodation in Violation of the ADA**
**(Against Corporate Defendant)**

64.     Plaintiff hereby realleges and incorporates each and every allegation contained in

paragraphs 1 through 63 with the same force as though separately alleged herein.

65.     The ADA mandates that an employer engage in an interactive process to provide

a reasonable accommodation for an employee's disability.

66.     Corproate Defendant repeatedly refused to engage in the interactive process to

identify a reasonable accommodation for Plaintiff's disability and ignored Plaintiff's multiple

requests for a reasonable accommodation.

67.     As a direct and proximate consequence of Corporate Defendant's failure to

provide a reasonable accommodation, Plaintiff's employment was terminated due to alleged

performance inadequacies resulting from her disability.

68.     Plaintiff has suffered, and continues to suffer, substantial damages, including but

not limited to emotional distress and suffering, all in amounts to be determined at trial.

69.     Corporate Defendant's discriminatory treatment of Plaintiff was willful and in

reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of

punitive damages against Defendant.

## SECOND CAUSE OF ACTION
### Unlawful Termination in Violation of the ADA
### (Against Corporate Defendant)

70.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 69 with the same force as though separately alleged herein.

71.     The ADA states, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

72.     At all relevant times, Plaintiff was qualified to perform her job responsibilities. She could perform the essential functions of her job with a reasonable accommodation, namely, working the night shift.

73.     Corproate Defendant discriminated against Plaintiff based on her disability by terminating her employment because she is disabled.

74.     As a direct and proximate consequence of Corporate Defendant's disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

75.     Corporate Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## THIRD CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation in Violation of the NYSHRL
### (Against All Defendants)

76.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 75 with the same force as though separately alleged herein.

77. The NYSHRL mandates that an employer engage in an interactive process to provide a reasonable accommodation for an employee's disability.

78. Defendants repeatedly refused to engage in the interactive process to identify a reasonable accommodation for Plaintiff's disability and ignored Plaintiff's multiple requests for a reasonable accommodation.

79. As a direct and proximate consequence of Defendants' failure to provide a reasonable accommodation, Plaintiff's employment was terminated due to alleged performance inadequacies resulting from her disability.

80. Plaintiff has suffered, and continues to suffer, substantial damages, including but not limited to emotional distress and suffering, all in amounts to be determined at trial.

81. Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

**FOURTH CAUSE OF ACTION**
**Unlawful Termination in Violation of the NYSHRL**
**(Against All Defendants)**

82. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 81 with the same force as though separately alleged herein.

83. The NYSHRL mandates that no employer discriminate against a qualified individual on the basis of disability in regard to the terms and conditions of his or her employment.

84. At all relevant times, Plaintiff was qualified to perform her job responsibilities. She could perform the essential functions of her job with a reasonable accommodation, namely, working the night shift.

85.     Defendants discriminated against Plaintiff based on her disability by terminating her employment because she is disabled.

86.     As a direct and proximate consequence of Defendants' disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

87.     Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

## REQUESTS FOR RELIEF

**WHEREFORE**, the individually named Plaintiff respectfully requests that this Court grant the following relief:

A.      on Plaintiff's first claim, damages to be determined at trial;

B.      on Plaintiff's second claim, damages to be determined at trial;

C.      on Plaintiff's third claim, damages to be determined at trial;

D.      on Plaintiff's fourth claim, damages to be determined at trial;

E.      an award of pre-judgment and post-judgment interest;

F.      an award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

G.      such other and further relief as this Court deems appropriate.


Dated: New York, New York
       June 9, 2017

By: s/ Walker G. Harman, Jr.
Walker G. Harman, Jr. [WH-8044]
Edgar M. Rivera [ER-1378]
THE HARMAN FIRM, LLP
220 Fifth Ave., Suite 900
New York, New York 10001
(212) 425-2600
wharman@theharmanfirm.com
erivera@theharmanfirm.com

*Attorneys for Plaintiff*